## STATE OF CONNECTICUT *v.* CHADWICK ST. LOUIS
### (AC 32594)

Lavine, Alvord and Peters, Js.

Argued March 10—officially released May 17, 2011

*Deborah G. Stevenson*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Chadwick St. Louis, appeals from the judgment of conviction, rendered after a trial before a three judge court, of one count of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the court improperly denied his motions (1) for a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), because the police, either knowingly and intentionally or with reckless disregard for the truth, made a false statement and omitted exculpatory information in their affidavits in support of their applications

for the search and arrest warrants, (2) to dismiss because the search and arrest warrants were deficient as to probable cause and the search warrant was executed improperly, (3) to suppress statements he made to the police because the police failed to provide him with *Miranda*[1] warnings, failed to arrange for counsel upon his request and continued to interrogate him after he had requested counsel, (4) to suppress physical evidence obtained as a result of an unlawful search warrant, (5) for acquittal because the state failed to prove beyond a reasonable doubt the exact time or location when and where the offense took place and (6) for a new trial. We reject all of the defendant's claims and affirm the judgment of the trial court.

The following facts and procedural history are relevant to the defendant's appeal. Christopher Petrozza worked for the defendant in his landscaping business. Petrozza and the defendant also socialized together outside of the workplace, and the defendant became financially indebted to Petrozza.

On September 14, 2006, Petrozza purchased a 1998 Audi for $5789 in cash. After purchasing the vehicle, Petrozza was short on funds and on September 29, 2006, Petrozza's mother, with whom he resided, advised him to collect the money that was owed to him by the defendant. On this date, Petrozza went to the defendant's home in Manchester. While Petrozza was at the defendant's home, the defendant intentionally caused Petrozza's death by striking him with a skid-steer loader, commonly known as a "Bobcat." After killing Petrozza, the defendant took Petrozza's driver's license and buried Petrozza's body in the rear yard of his residence, covering the grave with large ornamental rocks.[2]

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] On September 30, 2006, the defendant called Petrozza's mother and told her that Petrozza had been arrested and was jailed under an assumed name. The defendant told her that he was attempting to post bail for Petrozza and

After killing Petrozza, the defendant broke into a vehicle parked at his daughter's day care center and took a purse that contained a checkbook. The defendant went to a credit union and attempted to use Petrozza's license to cash a check from the stolen checkbook that he had forged and made payable to Petrozza.

On February 19, 2007, the Manchester police arrested the defendant on charges unrelated to the disappearance of Petrozza. The defendant indicated during the booking process that he had information relevant to the individual who was responsible for recent car break-ins. Several days later, the defendant told the police that Petrozza was responsible for the burglaries. In response, the police prepared a warrant for the arrest of Petrozza.

At his own initiative, the defendant continued to communicate with the Manchester police, the state police and the office of the state's attorney while he was incarcerated. Despite having provided police with information about criminal activity perpetrated by third parties, the defendant was not offered a reduced sentence for the crimes related to his February 19, 2007 arrest. The defendant then began to tell the police about the existence of a dead body in an effort to receive leniency for the February 19, 2007 arrest. After he met with the Manchester police several times, on June 5, 2007, the defendant admitted to having caused the death of Petrozza and described the circumstances of Petrozza's death as an "accident." On June 19, 2007, the police recovered Petrozza's body from the yard of the defendant's residence.

The defendant was charged with one count of murder and on March 3, 2009, elected to be tried by a panel of three judges. On May 27, 2009, the defendant was

that if she would provide him with $1200, he would contribute the same amount to secure Petrozza's release.

convicted and sentenced to fifty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erred in denying his motion for a hearing pursuant to *Franks* v. *Delaware,* supra, 438 U.S. 154, because the police, either knowingly and intentionally or with reckless disregard for the truth, provided false information in the separate search and arrest warrant affidavits and omitted exculpatory information.[3] We disagree.

The following facts are relevant to the defendant's claim. On June 15, 2007, members of the Manchester police department submitted an application for a search warrant to enter upon and search the exterior premises of the defendant's property for Petrozza's body. In the affidavit in support of their application, the affiants stated that they had met with Matthew Palermo. The affiants alleged that Palermo told them that he purchased an Audi from the defendant for $4000 and that as he was signing the bill of sale and other paperwork, he saw Petrozza's name as the listed owner.[4] They also

---

[3] "In *Franks* v. *Delaware,* supra, [438 U.S.] 155–56, the United States Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the [f]ourth [a]mendment requires that a hearing be held at the defendant's request. . . . The court in *Franks* mentioned only a false statement . . . included . . . in the warrant affidavit; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit. . . . If the ensuing *Franks* hearing discloses either an intentional or reckless falsehood, the court must excise that material from the affidavit and judge the probable cause of the affidavit shorn of that material." (Citation omitted; internal quotation marks omitted.) *State* v. *Therrien,* 117 Conn. App. 256, 262, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009).

[4] According to the affidavit, the defendant told Palermo that Petrozza turned the car over to him to satisfy a loan.

alleged that when Palmero attempted to register the Audi with the department of motor vehicles (department), he learned that he needed to get the Audi's paperwork notarized by Petrozza because he was the title owner. Palermo asked the defendant several times to put him in contact with Petrozza so he could have the paperwork notarized but the defendant stated that he could not get in touch with Petrozza. Finally, the affiants alleged that Palermo never signed Petrozza's name to any of the paperwork. On August 10, 2007, the police submitted a separate application for a warrant to arrest the defendant for murder. The affidavit in support of the arrest warrant contained the information concerning the sale of the Audi and Palermo's efforts to register it with the department, but it did not include anything about Palermo stating that he never signed Petrozza's name to any of the paperwork.

On December 11, 2008, the defendant filed a motion for a *Franks* hearing and corresponding motion to dismiss. The defendant claimed that, in their separate applications for the search and arrest warrants, the police did not include all of the information they received from their interview with Palermo. The defendant further claimed that the police included a false statement in the affidavit for the search warrant. This false statement, according to the defendant, led the court to conclude that there was probable cause to believe that the defendant killed Petrozza and then forged Petrozza's name to the bill of sale for the Audi so he could transfer the vehicle to Palermo for financial gain. Specifically, the defendant argued that the police omitted the portion of Palermo's statement in which he told the police that out of frustration, he was able to get the Audi's paperwork notarized so he could register the vehicle with the department without Petrozza being present and, instead, the police included a false statement in the affidavit that Palmero never forged

Petrozza's name on any of the paperwork.[5] This omission, the defendant claimed, entitled him to a *Franks* hearing because it falsely led the judge to believe that he had committed murder.

On March 11, 2009, the court held a hearing on the defendant's motion. The court concluded: "[T]he sentence, the Palermo sentence, omitted, is not material to the determination of probable cause. Whether or not Palermo had to forge documents to register the vehicle does not bear on the financial motive of the defendant. . . . [T]he simple fact is, the inclusion of this sentence by Palermo in the affidavit in support of the search warrant would not have defeated probable cause." The court went on to conclude that the defendant had not carried his burden of making the required threshold showing in order to be accorded a *Franks* hearing. The issue for us to determine is whether the facts regarding who forged the department documents were relevant to the issue of probable cause to search the defendant's property and arrest him for murder.

We begin our review of the defendant's claim by detailing the requirements the defendant must satisfy to obtain a *Franks* hearing. "In order for a defendant to challenge the truthfulness of an affidavit underlying a warrant at a *Franks* hearing, he must: (1) make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) show that the allegedly false statement is necessary to a finding of probable cause. . . . If the allegedly false statement is set aside, however, and there remains sufficient evidence to establish probable

---

[5] Palermo later testified at the defendant's trial concerning the sale of the Audi. He stated that he signed the vehicle's paperwork because Petrozza could not be located and he needed to get the car registered. He also stated that he was able to get the paperwork notarized after he signed Petrozza's name.

cause, a *Franks* hearing is not necessary." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 863, 776 A.2d 1091 (2001).

"Not all omissions . . . even if intentional, will invalidate an affidavit. . . . In fact, an affiant may omit facts that he believes to be either immaterial or unsubstantiated. . . . Thus, before a defendant is entitled to a *Franks* hearing for an alleged omission, he must make a substantial preliminary showing that the information was (1) omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge, and (2) material to the determination of probable cause. . . . Even if the affiant picks and chooses the information that he includes in the affidavit, there is no *Franks* violation if, had the magistrate been so advised, he still would have been justified in issuing the warrant. . . . When reviewing whether a *Franks* hearing is warranted, we recognize that there is a longstanding rule that there is an underlying presumption of validity with respect to the affidavit supporting a warrant. . . . In summary, there can be no *Franks* violation when the omissions, if included in the . . . warrant affidavit, would not defeat probable cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 520, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

The defendant claims that the court erred in denying his motion for a *Franks* hearing because the police knowingly and intentionally, or with reckless disregard for the truth, omitted Palermo's full statement regarding registration of the Audi with the department, namely, that Palermo forged Petrozza's signature on the Audi's paperwork.[6] He also claims that the police knowingly

---

[6] The defendant also claims that the police discovered that there were two distinctly different signatures on the Audi's paperwork and failed to give the court the department documents showing two different signatures. The defendant argues that the police should have presented the court with

and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit, namely, that Palermo did not forge Petrozza's name on any of the Audi's paperwork. The defendant further claims that the police only included portions of Palermo's statements that supported their theory that the defendant, not Palermo, likely committed the murder. In other words, the defendant claims that the omitted and false statements were relevant to the finding of probable cause because they undermined and negated the police theory that the defendant had a financial motive for killing Petrozza.

Assuming, arguendo, that the defendant has established that the police omitted the allegedly exculpatory information and included the allegedly false statement either intentionally or with reckless disregard for the truth—something that we note has not been proven—we conclude that the defendant's claim still fails. Even with the alleged omitted statements and without the alleged false statement, we conclude that there is still a basis to find probable cause. "Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has

---

the paperwork and that expert handwriting analysis of the different signatures was necessary for the determination of probable cause.

occurred. . . . Reasonable minds may disagree as to whether a particular affidavit establishes probable cause. . . .

"In determining the existence of probable cause to search, the magistrate should make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . In making this determination [of probable cause], the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate." (Citations omitted; internal quotation marks omitted.) *State* v. *Pappas*, supra, 256 Conn. 864–65.

"The police may lawfully seek and obtain a search warrant for an investigatory search for which it has been established that there is probable cause to believe that the objects sought constitute evidence of a crime and are located at the site to be searched." *State* v. *Vincent*, 229 Conn. 164, 171, 640 A.2d 94 (1994). "When reviewing an application [for a warrant], courts must also bear in mind that search warrants are directed . . . not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of [a] crime will be found. . . . The affidavit in support of a warrant need not present information that would justify the arrest of the individual in possession of or in control of the property. Nor is it required that the owner be suspected of having committed a crime. Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant." (Internal quotation marks omitted.) *State* v.

*Buddhu*, 264 Conn. 449, 463–64, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

In the affidavit in support of the application for the search warrant, the police represented that the defendant had stated that he was prepared to disclose information about a corpse and that an accident had occurred in Manchester. The affiants stated that when the police asked the defendant if the accident involved Petrozza, the defendant stated that "Chris was my friend" and that Petrozza had been "crushed" with a piece of construction equipment. The defendant was asked later if the body, presumably Petrozza's, was buried, and the defendant said that "you're going to need a jackhammer." The affidavit also included statements made by one of the defendant's neighbors. The neighbor told the police that he remembered seeing a "big hole" in the backyard of the defendant's residence that could fit "a small car."

These statements by the defendant and his neighbor were more than sufficient to establish probable cause that Petrozza was dead and that evidence concerning that death was located on the defendant's property. The allegedly false statement concerning who had signed the Audi's paperwork was not essential for the court to find probable cause to search the defendant's property, and the omitted information similarly was not material to the determination of probable cause. Nor does it defeat the finding of probable cause. The defendant, therefore, is not entitled to a *Franks* hearing concerning the search warrant.

As noted, the affidavit in support of the arrest warrant contained much of the same information included in the affidavit for the search warrant. The arrest warrant affidavit also details that the police discovered Petrozza's body in the defendant's backyard after a search of the premises pursuant to a search warrant.

Additionally, the affidavit establishes that the police discovered that on September 29, 2006, the last day that Petrozza was seen alive, the defendant stole a checkbook from a vehicle parked at his daughter's day care, drove Petrozza's Audi to a credit union and used Petrozza's license to attempt to cash a check from the stolen checkbook that he made payable to Petrozza.

Finally, the affidavit included details of a meeting the affiant had with John Fantasia. According to the affidavit, Fantasia shared a holding cell with the defendant at the Manchester Superior Court on June 21, 2007, and the defendant began to tell Fantasia about the body the police found in his backyard. The defendant told Fantasia that "it was an accident" and that he "got paranoid" and buried the body. In a separate interview, Fantasia told the affiants that the defendant stated that, in reference to Petrozza, "I told him I was gonna fucking bury him," and, "fuck him, he shouldn't have played me."[7]

---

[7] The defendant claims that the court improperly determined that Fantasia was reliable because Fantasia originally told the police that the defendant had told him that "it was an accident" but later stated that the defendant said, "I told him I was gonna fucking bury him . . . ." The court concluded that Fantasia was reliable for three reasons: (1) he is named, (2) he spoke to the police officers directly during the investigation and (3) much of what he related to the police authority was corroborated elsewhere in the warrant. The court also considered the seemingly conflicting statements made by Fantasia and concluded that "[e]ven assuming his comments are attributably unreliable and removed from the four corners of the arrest warrant affidavit, we are of the opinion that it does not and would not affect probable cause."

In the context of a challenge to a search warrant, our Supreme Court has concluded that an informant with whom the police had met face-to-face is more reliable than an anonymous informant because the police can observe the informant's demeanor to determine his or her credibility, and the informant runs the greater risk that he may be held accountable if his information proves false. See *State* v. *Batts*, 281 Conn. 682, 704, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). We find that the same situation exists here and that the court properly found that Fantasia was reliable. We also agree with the court that, even if the affidavit did not include all of Fantasia's statements, there was still enough evidence to support a finding of probable cause.

"The validity of an arrest warrant depends upon whether the application for the warrant and the accompanying affidavit establish probable cause to believe that: (1) a crime has been committed; and (2) the person to be arrested committed the crime. . . . The affidavit must recite sufficient facts so that the judicial officer who issues the warrant can, relying solely on the information thus brought to his or her attention, make an independent determination that probable cause exists as to each element of every crime charged." (Citations omitted.) *State* v. *Heinz*, 193 Conn. 612, 616–17, 480 A.2d 452 (1984).

Viewing the information included in the affidavit in support of the arrest warrant as a whole, we conclude that there was overwhelming evidence to support a finding of probable cause to arrest the defendant for murder. As with the search warrant, the inclusion of the omitted information and the exclusion of the allegedly false statement would not have defeated probable cause. Accordingly, the court properly denied the defendant's motion for a *Franks* hearing on the arrest warrant.

II

The defendant next claims that the court improperly denied his motion to dismiss because (1) the search and arrest warrants were deficient in that their supporting affidavits contained insufficient evidence to establish that the defendant intentionally killed Petrozza and (2) the search warrant was improperly executed. Again, we disagree with the defendant.[8]

As noted, on December 11, 2008, the defendant filed a motion for a *Franks* hearing and a corresponding

---

[8] Because we conclude that the warrant authorizing the police to search the exterior of the defendant's residence was valid, and that the police properly executed the warrant, we also conclude that the court properly denied the defendant's March 13, 2008 motion to suppress evidence as fruit of an improper search.

motion to dismiss.[9] After denying the motion for a *Franks* hearing, the court also denied the defendant's motion to dismiss. Specifically, the court concluded that there was sufficient evidence to find probable cause to support the search warrant, the arrest warrant contained sufficient evidence to establish probable cause that the defendant had specific intent to cause the death of Petrozza and that the search warrant was executed properly.

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the [state] cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss will be de novo. . . . Factual findings underlying the court's decision, however, will not be disturbed unless they are clearly erroneous. . . . The applicable standard of review for the denial of a motion to dismiss, therefore, generally turns on whether the appellant seeks to challenge the legal conclusions of the trial court or its factual determinations." (Internal quotation marks omitted.) *State* v. *Winter*, 117 Conn. App. 493, 500, 979 A.2d 608 (2009), cert. denied, 295 Conn. 922, 991 A.2d 569 (2010).

A

The defendant first claims that the search and arrest warrants were deficient because their supporting affidavits did not contain sufficient evidence that the defendant intended to kill Petrozza. We conclude that the defendant's claim concerning the search warrant is without merit because the affiants were not required to establish probable cause that the defendant intentionally killed Petrozza but only that evidence of a crime

---

[9] The defendant's motion to dismiss included, inter alia, the same claims now raised on appeal.

would be found on the defendant's property. Furthermore, we rely on our earlier discussion of the affidavit in support of the arrest warrant and conclude that it was sufficient to establish probable cause to arrest the defendant for murder. See part I of this opinion.

Evidence supporting a finding that the defendant intentionally killed Petrozza is not required in an affidavit for a search warrant. See *State* v. *Buddhu*, supra, 264 Conn. 463–64. As noted, it is sufficient that the affiants present evidence that "(1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Internal quotation marks omitted.) *State* v. *Pappas*, supra, 256 Conn. 864. Because we already have concluded that there was probable cause to believe that Petrozza was dead and that there was evidence concerning his death located on the defendant's property, we need not address this claim further.

In denying the defendant's motion to dismiss concerning the arrest warrant, the court thoroughly discussed the affidavit in support of the warrant and concluded that the evidence was sufficient to establish that there was probable cause that the defendant not only caused Petrozza's death but that he did it intentionally. We agree with the court's conclusion and for the same reasons stated in part I of this opinion, we conclude that there was probable cause to arrest the defendant for murder.

B

The defendant claims that the court also erred in denying his motion to dismiss because the police exceeded the scope of the search warrant and the search warrant was executed improperly. Specifically,

the defendant claims that his rights under the fourth amendment to the United States constitution were violated because the search warrant did not authorize excavation of the defendant's property and did not permit members of the Manchester highway department to participate in the execution of the warrant. We disagree and conclude that the court properly denied the defendant's motion to dismiss.

"The [f]ourth [a]mendment to the United States constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures. Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause." (Internal quotation marks omitted.) *State* v. *Duffus*, 125 Conn. App. 17, 25, 6 A.3d 167 (2010), cert. denied, 300 Conn. 903, 12 A.3d 572 (2011). "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States* v. *Ross*, 456 U.S. 798, 820–21, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

The defendant first claims that his rights pursuant to the fourth amendment were violated because the warrant did not authorize the police to excavate the land surrounding his residence.[10] In support of his claim,

[10] The court rejected this argument by the defendant in denying his motion to dismiss, finding that "[i]t is noteworthy that a careful view of the title page of the search warrant identifies a document as not just a search warrant but a search and seizure warrant. Also, on the left-hand lower corner of the title page, the document provides the authority to search, quote, within or upon a certain person, place or thing, to wit: the exterior premises of [the defendant's property and] the ensuing, more particularized, description. That, within, I think, certainly authorizes a digging.

"It is clear, implicit in this language is the authority to dig on the particularly described premises. In the body of the search warrant, it is made clear that the authorities are searching for a body that may be buried on the particular premises described. It was certainly made known to the issuing

the defendant points to the portion of the warrant that provides that the police were authorized to "enter into or upon and search . . . [t]he exterior premises" of the defendant's property. Given the reality that dead bodies frequently are buried under the ground, we find the defendant's argument less than persuasive.

The application for the search warrant clearly established that the police were looking for Petrozza's body and that the defendant may have buried the body on his property. The affidavit included statements from the defendant in which he claimed that he knew the whereabouts of a body and that the police would need a "jackhammer" to find it. We agree with the court that, given the circumstances of this case, it was implicit in the warrant application that the police would need to excavate part of the defendant's property to fully execute the search.[11] We note that federal courts of appeal adjudicating this same issue also have concluded that the excavation of land is within the scope of a warrant that authorizes the search of an exterior premises. See, e.g., *United States* v. *Becker*, 929 F.2d 442, 446 (9th Cir. 1991) ("concrete slab was located within and was part of the yard and, thus, searching beneath it was clearly within the scope of the warrant").

The defendant also claims that his fourth amendments rights were violated because members of the Manchester highway department assisted the police in executing the warrant.[12] The defendant has not cited any authority from this jurisdiction, nor can we find

magistrate that the court is authorizing a digging for the item sought on the particularly described property."

[11] As noted, in the affidavit in support of the search warrant, the affiants described a conversation with the defendant in which he was asked if he buried the body, and the defendant responded that "you're going to need a jackhammer."

[12] During oral argument on the defendant's motion, the parties stipulated that members of the Manchester highway department assisted the police in the search of the defendant's property.

any, that dictates that civilians are prohibited from assisting the police in executing a search warrant. Again, the federal courts of appeal assist us in this matter. They have held, contrary to the defendant's argument, that, pursuant to the fourth amendment, the police may utilize private citizens in executing a search warrant if their assistance is legitimate. See, e.g., *Bills v. Aseltine*, 958 F.2d 697, 706 (6th Cir. 1992) ("[p]olice may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant . . . the bounds of reasonableness have not been overstepped").

It certainly was legitimate for the police to utilize the Manchester highway department in searching the exterior of the defendant's residence because in this case, as noted, there was evidence that the defendant had buried Petrozza's body and that the police would need a "jackhammer" to reach it. Accordingly, we conclude that the court properly denied the defendant's motion to dismiss.

### III

The defendant's third claim is that the court improperly denied his motion to suppress statements he made to the police because the police, in violation of his federal and state constitutional rights, failed to provide him with *Miranda* warnings, failed to arrange for counsel upon his request and continued to interrogate him after he had requested counsel. We conclude that the court properly denied the defendant's motion to suppress.

The following additional facts are relevant to the defendant's claim. The defendant made an oral motion to suppress statements he made to the police from February 19 to May 25, 2007. On March 11, 2008, he filed a motion to suppress statements he made to the police on June 1, 2007, and from June 4 to 7, 2007.

The court heard testimony from Jeffrey Lampson, a detective for the Manchester police, Richard Grimaldi, an officer with the Manchester police, and Richard Cousins and Stephen Kumnick, both inspectors from the office of the Hartford state's attorney, concerning these motions.

On February 19, 2007, the defendant was arrested on charges unrelated to this appeal. Grimaldi read the defendant his *Miranda* rights. Then Lampson, as was his standard practice, asked the defendant if he had any knowledge or information regarding any recent crimes in order to assist the defendant with his pending charges. On February 22, 2007, at the defendant's request, Lampson met with the defendant, who provided him with information concerning two thefts from motor vehicles that had occurred and identified Petrozza as the offender. Lampson did not consider the defendant a suspect in any additional crimes at this point and did not advise the defendant of his rights under *Miranda*.

On March 30, April 12 and May 25, 2007, Lampson met with the defendant again, each time at the defendant's request. Lampson did not provide the defendant with *Miranda* warnings at any of these meetings. During these meetings, the defendant provided Lampson with information concerning the motor vehicle break-ins and Petrozza's alleged role in the offenses. The defendant also told Lampson that Petrozza had contacted him while he was incarcerated and that he had been using an alias supported by a stolen driver's license. During the May 25, 2007 meeting, the defendant first told Lampson that he was being represented by his attorney, Brian Woolf, for the pending charges.

On May 31, 2007, Cousins called the defendant to speak to him about his status as a victim in another unrelated case. During the conversation, the defendant

asked Cousins if he had received a letter the defendant sent to him and to a prosecutor. Cousins said that he had not seen the letter but later went to the mail room and retrieved the letter. On June 1, 2007, Lampson received a telephone call from Kumnick. Kumnick told Lampson that he recently received a letter from the defendant in which he indicated that he knew the whereabouts of a body. Lampson met with the defendant that day and did not provide him with any *Miranda* warnings, and the defendant indicated that he was aware of the location of a buried female body.[13] Although Lampson was aware on this date that Petrozza was missing, the defendant still was not considered a suspect in Petrozza's disappearance.

On June 4, 2007, the defendant met with Cousins, Lampson and Kumnick at the office of the Hartford state's attorney. He was advised of his rights under *Miranda*, waived his rights and specifically told the police that he did not want Woolf present at the meeting. On this date, Lampson considered the defendant a suspect in the disappearance of Petrozza. The defendant requested to speak with Kumnick alone and indicated that he wanted guarantees relevant to his pending cases before he would provide further information, and he also requested that a public defender make the

---

[13] The defendant claims that on this date, he told Lampson that Woolf advised him not to talk to anyone. Specifically, the defendant claims that "[o]n June 1, 2007, the defendant told Detective Lampson that attorney Woolf advised him not to talk to anyone, yet Detective Lampson, who had not advised the defendant as to his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), continued to question the defendant." We are unable to find evidence in the record or at the specific page in the trial transcript that the defendant cites to in his brief that Woolf advised him not to talk to anyone. The defendant cites to page 101 of the transcript from March 11, 2009, for this proposition. The only reference made to Woolf on this page was by Lampson during his cross-examination by defense counsel: "And I thought that during one of those times he had mentioned attorney Woolf was his attorney or, you know, it was. I'm not sure which meeting, exactly."

agreement on his behalf. Cousins responded that he was not in a position to respond to the defendant's demands. No guarantees were given at this time.

In a written statement to the police on June 5, 2007, the defendant, after being advised of his rights under *Miranda*, admitted to causing the death of Petrozza and described the circumstances of Petrozza's death as an "accident." On June 6, 2007, the defendant asked Kumnick to contact Woolf, and Kumnick advised the defendant to put his request in writing and assured the defendant that the correspondence would be forwarded to counsel.[14]

The court denied the defendant's motion to suppress his statements to police, finding that the defendant had failed to prove that the police interrogated him between February 19 and May 25, 2007, because he was not a suspect in the disappearance of Petrozza. The court further found that a *Miranda* warning was not required on June 1, 2007, because the defendant was not then a suspect in Petrozza's disappearance, and, that from June 4 through 6, 2007, the defendant received proper *Miranda* warnings and made a valid waiver. Finally, the court concluded that although the defendant did make references to an attorney, regardless of whether the references were unequivocal, the police ceased all questioning after the references were made.

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . As we have noted previously, however, when a question of facts is essential to the outcome of a particular legal determination that implicates a defendant's

---

[14] The court concluded that all of the waivers of the defendant's rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), were knowing, voluntary and intelligent.

constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Silver*, 126 Conn. App. 522, 528–29, 12 A.3d 1014, cert. denied, 300 Conn. 931, 17 A.3d 68 (2011).

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is

reasonably likely to elicit an incriminating response.
. . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Internal quotation marks omitted.) *State* v. *Bridges*, 125 Conn. App. 72, 78–79, 6 A.3d 223 (2010), cert. denied, 300 Conn. 931, 17 A.3d 68 (2011).

"In *Miranda*, the court held that when an accused person indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning, and the police must stop the interrogation. . . . The court has since narrowed this aspect of the *Miranda* decision by emphasizing that the right to the presence of counsel during custodial interrogation is a prophylactic rule, rather than a per se constitutional requirement . . . and by holding that an accused's request for counsel under *Miranda* must be objectively unequivocal." (Citations omitted; internal quotation marks omitted.) *State* v. *Anonymous*, 240 Conn. 708, 720–21, 694 A.2d 766 (1997).

We conclude that the court properly denied the defendant's motion to suppress. As the court noted, although the defendant was in custody at all times from February 19 through June 6, 2007, he was not a suspect in the disappearance of Petrozza until June 4, 2007. The police, therefore, were not required to provide him with a *Miranda* warning prior to this date because the questions posed were not reasonably likely to elicit an incriminating response. Once the defendant became a suspect on June 4, 2007, the police provided the defendant with proper *Miranda* warnings before each conversation and the defendant provided valid waivers. Also, although the defendant made references to Woolf and a public defender, he never unequivocally invoked his right to counsel, and the record supports the court's

finding that the police ceased all questioning after these references to counsel.[15]

We also note that the meetings between the police and the defendant were initiated by the defendant and that he prompted inquiries by the police through letters concerning the whereabouts of a corpse. As recognized by the court, "[t]he defendant's conduct at all times demonstrates his earnest desire to talk to the police in order to provide the authorities with information in order to assist him, the defendant, in his predicament." See *State* v. *Smith*, 42 Conn. App. 41, 46, 680 A.2d 1340 (1996) (defendant's statement voluntary where, inter alia, he went to police station by own means and cooperated with police).

The defendant argues that the promises and assurances given to him by Lampson that he would support a more lenient sentence for the defendant if he provided the police with useful information about other crimes rendered the waiver of his *Miranda* rights involuntary. We disagree and conclude that the waivers were voluntary.

"Our Supreme Court has . . . clarified the proper scope of appellate review of a trial court's determination of voluntariness. [The proper scope of review regarding] the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness. . . .

---

[15] Although the defendant was represented by counsel on other charges, the police did not violate his rights under the sixth amendment to the United States constitution by questioning him about Petrozza. "[T]he sixth amendment right to counsel is offense-specific and commences only at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (Internal quotation marks omitted.) *State* v. *Birch*, 219 Conn. 743, 748, 594 A.2d 972 (1991).

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . . Factors that may be taken into account . . . include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Citations omitted; internal quotation marks omitted.) *State* v. *Banks*, 58 Conn. App. 603, 612–14, 755 A.2d 279, cert. denied, 254 Conn. 923, 761 A.2d 755 (2000).

We agree with the trial court that the defendant's waivers were voluntary. Lampson's requests for information about other crimes in return for leniency regarding the defendant's pending charges did not overbear the defendant's will. The defendant made a conscious choice, without any other pressure or influence, to waive his rights and provide the police with information in the hope that he would receive favorable treatment regarding the unrelated charges resulting from his February, 2007 arrest. There is nothing in the record to suggest that the defendant's will was overborne by any other factors. The defendant's waiver of his rights pursuant to *Miranda*, therefore, was voluntary.

IV

The defendant further claims that the court abused its discretion in denying his motion for a judgment of acquittal. Specifically, he argues that the court should have granted his motion because the state failed to prove the exact time when or the location where the

murder took place. We conclude that the court properly denied the motion for acquittal.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the [trier of fact] could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt . . . . [W]e have consistently employed a two-part analysis in appellate review of the sufficiency of the evidence to sustain a criminal conviction. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Taylor*, 126 Conn. App. 52, 57, 10 A.3d 1062, cert. granted on other grounds, 300 Conn. 925, 15 A.3d 629 (2011).

Section 53a-54a provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." The time or location of a killing is not an element of § 53a-54a, and, therefore, the state was not obligated to prove the time or location of the killing in order to convict the defendant of murder.

The defendant claims that the location of the killing is an essential element of the offense because it forms the basis of the court's jurisdiction. This claim is without merit. The amended information filed on March 10, 2009, specifically indicated that the defendant was charged with the crime of murder "in or near the town of Manchester . . . ." There was evidence presented at trial that the crime took place at the defendant's

residence, and the court concluded that on September 29, 2006, the defendant killed Petrozza at the defendant's residence in Manchester. The defendant has not challenged this factual finding by the court and has only now raised, for the first time, this jurisdictional challenge in his appeal of the court's denial of his motion for acquittal. We conclude, therefore, that there was sufficient evidence presented at trial to sustain the defendant's conviction and that the court properly denied the motion for acquittal.

V

In his final claim, the defendant argues that the court improperly denied his motion for a new trial. "[W]e review the trial court's decision on a motion for a new trial for abuse of discretion." *State* v. *Tomas D.*, 296 Conn. 476, 488, 995 A.2d 583 (2010).

In the defendant's motion for a new trial, he claimed that he was materially injured by the denial of his (1) motion to suppress statements he gave to the police, (2) motion to suppress evidence recovered from his premises and (3) motion for a *Franks* hearing. We already have concluded that the court properly denied these three motions and, therefore, we conclude that the court properly denied the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.